UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| RANDY HOLL,<br><br>                Plaintiff,<br><br>v.<br><br>THE AMALGAMATED SUGAR<br>COMPANY LLC, a Delaware Limited<br>Liability Company; and BLUE CROSS<br>OF IDAHO, a corporation,<br><br>                Defendants. | Case No. 1:13-cv-00231-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

The Court has before it cross-motions for summary judgment relating to the refusal to authorize and pay for medical treatment. Plaintiff Randy Holl filed this action alleging a violation of Section 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132, and seeking a declaration of coverage; damages, including general and emotional damages and reimbursement for medical services; and attorney fees. The Court heard oral argument on April 24, 2014, and took the matter

under advisement. For the reasons explained below, the Court will grant Defendants'
Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary
Judgment.

## BACKGROUND AND FACTS

The parties do not dispute that this is an ERISA case. Holl is a participant of a
health insurance plan with Defendant Blue Cross of Idaho through his employer, The
Amalgamated Sugar Company, LLC (Amalgamated). The Plan under which Holl is a
participant provides that the Plan Administrator, Amalgamated, is the "sole fiduciary of
the Plan, [and] has all discretionary authority to interpret the provisions and to control the
operation and the administration of the Plan." Blue Cross is the third party Claim
Administrator of the Plan.

Holl suffers from Seropositive Myasthenia Gravis ("SMG"), an autoimmune
condition which causes muscle fatigability and weakness, and can involve all four limbs,
the diaphragm, bulbar muscles and ocular muscles. Holl's treating physicians have
prescribed IvIG infusion therapy for treatment of Holl's SMG. Blue Cross paid for prior
IvIG infusions during 2006 and 2007. In January of 2010, Holl again requested
preapproval for treatment of his SMG with IvIG infusions. His request was the subject of
prior litigation in this Court, and the matter was settled. *See Holl v. The Amalgamated
Sugar Co. LLC*, No. 1:11-cv-198-EJL-CWD. Holl released any request for IvIG up to the
date of the Release, signed April 5, 2012.[1]

---

[1] Defendants object to the Court's consideration of the above facts relating to Holl's prior
treatment in 2006, 2007, and 2010 with IvIG infusions. However, as will be explained later in this
(Continued)

The present case involves the denial of a pre-authorization request for coverage for IvIG infusions submitted in July of 2012, and Blue Cross's continued refusal to authorize IvIG therapy. Pl. Reply at 2 (Dkt. 36.) According to the administrative record,[2] the following information was presented to and considered by Blue Cross.

Holl's physician, Dr. Cline, submitted a Pharmacy Prior Authorization Request, dated July 6, 2012, requesting pre-authorization for five IvIG infusions on a monthly basis from July 9, 2012, through December 31, 2012. Blue Cross denied the Pre-Authorization Request as not medically necessary on September 6, 2012. (Dkt. 23-1 at 13.) As a reason for its decision, Blue Cross relied upon the General Exclusions and Limitations Section of the Plan, which excludes benefits for services, supplies, drugs or other charges that are "Not Medically Necessary. If services requiring Prior Authorization by Blue Cross of Idaho are performed by a Contracting Provider and benefits are denied as not Medically Necessary, the cost of said services are not the financial responsibility of the Participant."

The Plan states that the fact a Covered Provider may prescribe, order or recommend a service does not determine Medical Necessity. Medical Necessity under the Plan is defined as follows:

—————————————————

Memorandum, these facts are not material to the Court's decision, and are provided for background and context only.

[2] Defendants submitted a complete copy of the Administrative Record attached to the Affidavit of Sam Diddle at Docket 23. Duplicates of specific documents contained in the Administrative Record are found also at Docket 26, attached to the Defendants' Statement of Undisputed Facts. Because of the medical information contained in the Administrative Record, the filings were sealed.

Medically Necessary (or Medical Necessity)---the Covered Service or Supply Recommended by the treating Covered Provider to identify or treat a Participant's condition, Disease, Illness or Accidental Injury and which is determined by BCI to be:

1. The most appropriate supply or level of service, considering potential benefit and harm to the Participant.
2. Proven to be effective in improving health outcomes;
   a. For new treatment, effectiveness is determined by peer reviewed scientific evidence;
   b. For existing treatment, effectiveness is determined first by peer reviewed scientific evidence, then by professional standards, then by expert opinion.
3. Not primarily for the convenience of the participant or Covered Provider.
4. Cost Effective for this condition.[3]

The September 6, 2012[4] denial letter explained that Blue Cross considered Holl's medical records, Blue Cross Blue Shield Association Technology Evaluation Center (TEC) assessments, the Blue Cross Blue Shield Association Medical Policy Reference Manual, Blue Cross of Idaho Medical Policies, and other guidelines. According to Blue Cross, IvIG infusions are considered medically necessary for SMG in patients with "chronic debilitating disease in spite

---

[3] A complete copy of the Blue Cross Group Plan is found at Docket 23-6 at pp. 8-76.

[4] There was a prior letter dated August 28, 2012, denying the request for benefits based upon the review of the information provided by Dr. Cline. (Dkt. 23-3 at 36, 23-5 at 11.) The August 28, 2012 letter requested Holl's prescription history, and that pending receipt, the request for benefits may be reconsidered. The August 28, 2012 letter enclosed copies of Blue Cross policies, the manuals, and the prior July 11, 2011 review by the Medical Review Institute of America ("MRIA") regarding Holl's request in 2011 for IvIG treatment. (Dkt. 23-5 at 14 – 23-6 at 7.) The MRIA was asked whether it agreed with Blue Cross's determination in 2011 that the requested service for IvIG was not medically necessary. The MRIA noted that IvIG can be considered for myasthenic crisis, but that its "efficacy for chronic myasthenia gravis is unproven. There is no evidence that the patient is undergoing myasthenic crisis. IvIG is not medically necessary for this patient's condition." The MRIA indicated it agreed with the 2010/2011 denial of benefits. (Dkt. 23-5 at 46-47.) The September 6, 2012 letter, however, appears to be the operative denial letter from which the first appeal followed.

of treatment with cholinesterase inhibitors, or complications from or failure of corticosteroids and/or azathioprine."

The letter further explained that, according to Blue Cross's review of Holl's records, his use of alternative treatments was not consistent, and there was a gap in prescription history between December 26, 2011, and May 9, 2012. Efforts to obtain additional information from Holl regarding Holl's prescription history were unsuccessful. Without information regarding prescription history and medication use, Blue Cross determined there was insufficient information to substantiate the medical necessity of the service. Further, Blue Cross cited Holl's other medical conditions, including gout, hypertension, pulmonary disease/bronchitis, osteoporosis, depression, history of acute renal failure, and recent injury. Consequently, Blue Cross determined that there was insufficient information in the medical record to demonstrate that SMG was the cause of Holl's chronic debilitating disease, or that IvIG would resolve his debilitating condition.

On January 9, 2013, Holl appealed the denial of pre-authorization. (Dkt. 23-3 at 33.) With his appeal letter, Holl submitted a letter dated January 3, 2013, from his treating physician, Dr. Cline. (Dkt. 23-3 at 34.) Dr. Cline's letter was submitted to justify Holl's ongoing treatment for SMG with IvIG therapy. In response to Blue Cross's determination that Holl's use of corticosteroids and Azathioprine had been inconsistent, Dr. Cline explained that the gap in prescriptions could be explained by Holl's hospitalizations, during which

medications would have been given in the hospital. But Dr. Cline could "not answer whether or not Mr. Holl took the medicines as proscribed."

In Dr. Cline's opinion, however, any failure to take prescribed medications "does not have any bearing on his current treatment, as we know from past history this [drug therapy regimen] was not sufficient to control his disease." Dr. Cline further explained Holl's drug therapy regimen, and supported her conclusion that IvIG therapy would be beneficial for treatment of Holl's generalized myasthenia gravis, because the disease was interfering with his daily life and drug therapy was not controlling Holl's symptoms. (Dkt. 23-3 at 35.) Dr. Cline explained that Azathioprine had been causing side effects, CellCept had been insufficient to control Holl's disease, and Cyclosporine was not a viable option given Holl's chronic kidney disease. *Id.* Dr. Cline was of the opinion also that Holl had recuperated from the March 2012 auto accident, and that the "sole cause for his weakness and fatigability is myasthenia gravis." *Id.*

Following receipt of Dr. Cline's letter and the appeal, BCI requested additional medical records from Holl's healthcare providers and conducted a second medical review. The medical records submitted for review established the following.

On January 1, 2011, Holl was admitted to the hospital suffering from renal insufficiency. (Dkt. 23-1 at 81.) Significant medical history was noted as myasthenia gravis. At that time, Dr. Swenson noted Holl was taking his medications, including Mestonin and CellCept. Holl was admitted to the hospital

to treat his renal insufficiency. On May 2, 2011, Dr. Swenson evaluated Holl and noted that, over the "past several years and more acutely over the past several months, [Holl's] functional status has declined rapidly." (Dkt. 23-1 at 77.) Dr. Swenson's assessment was myasthenia gravis, with resulting disability.

On July 19, 2011, Holl was admitted to the emergency room for evaluation of lower extremity edema. (Dkt. 23-2 at 44; 26-2 at 60.) Past medical history was noted as atrial fibrillation, myasthenia gravis, hypertension, renal insufficiency, asthma, gout, arthritis, depression, insomnia, and obesity. Holl was discharged to the care of his physicians for treatment of his renal insufficiency and advised to see a kidney specialist.

On November 23, 2011, Holl saw nephrologist Dr. Narasimhan for a follow up visit for Holl's chronic kidney disease. (Dkt. 23-4 at 6.) Dr. Narasimhan noted that Holl's energy level was "good to fair," and observed improvement of his lower extremity edema with elevation. Dr. Narasimhan noted that Holl's acute kidney injury had resolved, but that Holl appeared hypervolemic and did not provide any symptoms of obstructive nephropathy. (Dkt. 23-4 at 10.) Dr. Narasimhan noted that the use of IvIG can cause acute kidney failure, although it was a rare complication and could be avoided by good hydration and avoidance of sucrose.

On March 14, 2012, Dr. Swenson admitted Holl to the hospital based upon laboratory reports reviewed from the day prior indicating low creatinine levels. (Dkt. 23-1 at 63.) Dr. Swenson noted that, based upon Holl's laboratory reports,

Holl was suffering from multi-organ failure and cardiogenic shock. Holl was transferred to the intensive care unit following admission. Dr. Swenson was unsure of the etiology of Holl's condition, but suspected it was secondary to the injuries Holl sustained in a recent motor vehicle accident that occurred on March 11, 2012.

On April 4, 2012, Holl's physician, Dr. Swenson, saw Holl for follow up after the motor vehicle accident and multi-organ failure following the accident. (Dkt. 23-1 at 59, 26-2 at 63.) Dr. Swenson reported that Holl was doing much better after having suffered renal, hepatic, and cardiogenic shock and pulmonary failure. Dr. Swenson discussed the scheduled IvIG infusions that Dr. Cline had ordered.

On May 7, 2012, Dr. Cline, Holl's treating neurologist, saw Holl for a follow up visit. (Dkt. 23-3 at 52.) It was Holl's first visit with Dr. Cline since October of 2011. She indicated Holl's myasthenic symptoms were worse, with more ocular symptoms and ptosis of both eyes, muscle weakness, and difficulty swallowing. Dr. Cline noted Holl was short of breath as well. Dr. Cline's impression was that his SMG was causing increasing fatigable muscle weakness despite treatment with steroids and CellCept. Her recommendation at that time was use of IvIG therapy, and referral to a pulmonologist. (Dkt. 23-3 at 53.)

On May 22, 2012, Dr. Swenson's progress note indicated Holl's pulmonary function test, performed on May 17, 2012, revealed significant restrictive disease. (Dkt. 23-3 at 62; 26-1 at 27.) Dr. Swenson noted that, upon exertion, Holl's

oxygen saturation dipped; he was of the opinion that "there is some restrictive lung disease. Some of this certainly could be secondary to muscular involvement and the inability to fully extend. Certainly, I suspect a greater part of this is secondary to intrinsic lung disease and restrictive disease." (Dkt. 26-1 at 27.) Dr. Swenson noted also that Holl failed his sleep study. In Dr. Swenson's assessment, Holl was suffering from restrictive lung disease, that obesity was playing a part in the disease, and "possibly myasthenia." (Dkt. 23-1 at 49.) According to the May 17, 2012 notes of pulmonologist Dr. Krawtz, Holl has a diagnosis of myasthenia gravis, but that it was "hard to know if any of the current impairment [in pulmonary function] could be accounted for by his myasthenia in light of the current abnormalities being explained by the patient's obesity." (Dkt. 26-1 at 33.)

On June 26, 2012, nephrologist Dr. Narasimhan saw Holl for evaluation of his renal function. (Dkt. 23-3 at 63-64.). Dr. Narasimhan noted that Holl's chronic kidney disease stage III was secondary to vasomotor nephropathy from steroid use, but that Holl's renal function was "back at baseline." Holl's recent acute kidney failure was of unknown etiology, but Holl may have had an episode of contrast-induced nephropathy. Dr. Narasimhan noted that Holl had started IvIG therapy for his SMG, which has "had a positive impact subjectively." Dr. Narasimhan noted that Holl self-reported increased stamina and less fatigue. (Dkt. 23-3 at 65.)

In a June 28, 2012 progress note, Dr. Cline noted Holl's medical history, including his diagnosis of SMG, chronic kidney disease stage III; acute kidney

injury March 2012, following a motor vehicle accident; hypertension; and obstructive sleep apnea. (Dkt. 23-3 at 50-51.) Dr. Cline noted that Holl had received IvIG infusion 3 ½ weeks ago, but "his strength did not improve as much as she thought. He still has difficulty getting up out of the chair, in fact this has not improved at all. Diplopia still occurs occasionally…Ptosis is not better…He is able to walk a little bit longer….It is not clear to him to what extent his dyspnea is related to pulmonary or cardiac issues, versus the myasthenia gravis." (Dkt. 26-1 at 30.)[5] Dr. Cline's notes indicate Holl has been told to use oxygen 24 hours a day.

Dr. Cline's impression was that Holl "has not had as robust a response to IvIG as I would have wanted. His clinical picture is confusing, as it is difficult to determine how much pulmonary/cardiac disease contributes to his complaints, versus fatigable myasthenic weakness. I suspect the general medical conditions may be contributing more to his complaints of breathlessness at this time than the myasthenia gravis, but am not certain. His multiple comorbidities make it difficult to manage his myasthenia gravis." Dr. Cline recommended that Holl continue IvIG every four weeks until he was able to see a neuromuscular specialist.

On July 3, 2012, Holl's medical imaging report indicated possible congestive heart failure. (Dkt. 23-2 at 39; 26-2 at 58.) Medical imaging reports dated August 2, 2012, noted no new complications after the motor vehicle accident

---

[5] Handwritten notes dated June 5, 2012, indicate Holl received IvIG on June 1, 2, 3, and 4th. (Dkt. 23-3 at 55.) The present lawsuit does not involve these dates of treatment.

on March 11, 2012, from which Holl suffered a fracture of the transverse process and low back pain. (Dkt. 23-2 at 38.)

On July 24, 2012, Holl returned for a follow up visit with Dr. Krawtz for his respiratory failure, obesity, and alveolar hypoventilation. (Dkt. 23-3 at 72.) Dr. Krawtz recounted Holl's medical history, including his March 2012 hospitalization for multisystem organ failure following the motor vehicle accident. Dr. Krawtz noted Holl had lost weight secondary to removal of edema, with a current weight of 332 pounds. *Id.* Dr. Krawtz noted that Holl had received monthly IvIG therapy for his SMG, and that it was "hoped that he can wean his prednisone down if he is getting benefit." Further, the chart notes indicate Holl was receiving benefit from the AVAPS device, and had been sleeping better and feeling better as a result. Dr. Krawtz's impression was that Holl had improved, and he continued to recommend use of the AVAPS for treatment of Holl's severe sleep disorder. (Dkt. 23-3 at 73.)

On October 11, 2012, Holl was seen for a follow up visit by Dr. Krawtz at the sleep disorder clinic for his sleep disorder and chronic respiratory failure. (Dkt. 23-4 at 2; Dkt. 26-1 at 36.) At that time, Holl reported using his AVAPS, that he was sleeping much better, and feeling better during the day. Holl reported that he was seen at the Myasthenia Clinic in Utah, but "they have no additional suggestions." Medications noted were oxygen, his AVAPS device at night with oxygen, albuterol, ipratropium, Lasix, prednisone, CellCept, and Mestinon. Dr. Krawtz noted a 20 pound weight gain as well, up to 358 pounds.

On November 26, 2012, Holl underwent a procedure to repair an incarcerated umbilical hernia. (Dkt. 23-3 at 41.) The hernia was causing discomfort. (Dkt. 23-3 at 43.)

On March 29, 2013, Blue Cross responded to Holl's appeal of the denial of preauthorization requests for monthly IvIG infusions ordered by Dr. Cline to treat Holl's chronic SMG. (Dkt. 23-2 at 56; 26-1 at 42.) In addition to citing the above medical records, the letter noted that the medical records from Holl's treatment at the University of Utah were not submitted, and that there were no clinic notes from Dr. Cline submitted after June 28, 2012, to document Holl's current disease state or active therapies.

Blue Cross upheld its prior decision to deny benefits as not medically necessary. The determination noted that the records contained insufficient information concerning symptoms of significant debilitation from myasthenia gravis that were separate from that expected due to Holl's other medical conditions, and insufficient information regarding contra-indications or failure of other treatments and recommended treatments per the specialists at the University of Utah. Blue Cross noted also that Dr. Cline's January 3, 2013 letter was inconclusive regarding whether Mr. Holl was taking his medications as prescribed, and cited her June 28, 2012 progress note regarding the lack of response from the IvIG infusions. Blue Cross invited an additional appeal, and submission of additional records.

On April 25, 2013, Holl appealed the March 29, 2013 denial of preauthorization request. (Dkt. 26-2 at 2.) No additional records were submitted. Rather, Holl argued that the reviewer "misinterpreted Dr. Cline's letter of January 13, 2013." Blue Cross documented on May 2, 2013, that it had received Holl's second appeal on April 26, 2013. (Dkt. 23-1 at 8.)

In response, on May 8, 2013, Blue Cross again denied the request for preauthorization. (Dkt. 26-2 at 5.) The letter noted the lack of additional medical information provided in support of Holl's second level appeal. Therefore, Blue Cross again denied the request. The letter notified Holl of his right to have the decision reviewed by independent external reviewers. Holl filed this lawsuit on May 16, 2013.

## ANALYSIS

### 1. Standard for Summary Judgment

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence in a light most favorable to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The moving party bears the burden of showing that there is no material factual dispute, and the court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Celotex*, 477 U.S. at 324. Material facts which would preclude summary judgment are those which may affect the outcome of the case. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). The relevant substantive law will determine which facts are material for purposes of summary judgment. *Id.*

Where, as here, both parties move for summary judgment, the summary judgment standard does not change, and the court must evaluate each party's motion on the merits. *Farm Bureau Ins. Co. of Idaho v. Kinsey*, 234 P.3d 739, 742 (Idaho 2010) (citation omitted); *see also Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (applying traditional summary judgment standards to cross-motions for summary judgment in ERISA benefits denial case). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing there is no genuine issue of material fact by demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party establishes an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosp. Inc*., 929 F.2d 1404, 1409 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. *Celotex*, 477 U.S. at 323.

Where the moving party instead bears the burden of proof on an issue at trial, "it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. That is, the moving party must prevent evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case." *Sabatino v. Liberty Life Assur.*

*Co. of Boston*, 286 F.Supp. 2d 1222, 1229 (N.D. Cal.2003) (citing *UA Local 343 v. Nor–Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994)).

## 2.    ERISA Standard of Review

ERISA requires that a plan fiduciary administer an ERISA plan for the purpose of "providing benefits to participants and their beneficiaries" and "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(A)(i), (a)(1)(D); *see also id.* § 1002(8) (defining a "beneficiary" as "a person designated by a participant, or by the terms of an employee benefit plan"). In actions challenging denial of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), the district court reviews de novo "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan unambiguously confers discretionary authority, the standard of review shifts to abuse of discretion. *Id.*; *see also Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999).

The first step of analysis is to examine whether the terms of the ERISA plan here unambiguously granted discretion to the administrator. The Blue Cross Policy provides that the Plan Administrator, Amalgamated, is the "sole fiduciary of the Plan, [and] has all discretionary authority to interpret the provisions and to control the operation and the administration of the Plan." Blue Cross is the third party Claim Administrator of the Plan. The Ninth Circuit has repeatedly held that plan wording which, like the language at issue, grants the power to interpret plan terms and to make final benefits determinations confers discretion on the plan administrator. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955,

963 (9th Cir. 2006) (citing *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002) *and Grosz–Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1159 (9th Cir. 2001)). The Blue Cross Policy bestows on the administrator full discretion and authority to both interpret all terms and provisions of the plan and determine eligibility for benefits. Under Ninth Circuit and Supreme Court precedent, the Policy clearly vests discretion in Amalgamated, the plan administrator.

After finding the plan unambiguously confers discretion, the Court proceeds to review the plan administrator's decision under the deferential abuse of discretion standard of review. An ERISA administrator abuses its discretion if it: "(1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005).

But, a structural conflict of interest exists where, as here, an insurer acts as both the administrator and funding source for an ERISA plan.[6] *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999). In that case, a less deferential standard is triggered because Amalgamated operates under a structural conflict of interest. The Supreme Court has indicated that a structural conflict of interest, even if merely formal and unaccompanied by any evidence of bad faith or self-dealing, should have some effect on

---

[6] A conflict of interest exists in such circumstances because, while the administrator is responsible for administering the plan so that those who deserve benefits receive them, the administrator also "has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers." *Abatie*, 458 F.3d at 966 (citation omitted). The Plan here is an employer-funded group health benefit plan.

judicial review. *Firestone*, 489 U.S. at 115. In *Abatie*, the Ninth Circuit clarified that

*Firestone* requires abuse of discretion review whenever an ERISA plan grants discretion

to the plan administrator, but that such review must be "informed by the nature, extent,

and effect on the decision-making process of any conflict of interest that may appear in

the record." *Abatie*, 458 F.3d at 967.

The level of skepticism "with which a court views a conflicted administrator's

decision may be low if a structural conflict of interest is unaccompanied, for example, by

any evidence of malice, of self-dealing, or of a parsimonious claims-granting history." *Id*.

at 968. A conflict of interest should be weighed more heavily if, for example, the

administrator provides inconsistent reasons for denial, fails to adequately investigate a

claim or ask the plaintiff for necessary evidence, fails to credit a plaintiff's reliable

evidence, or has repeatedly denied benefits to deserving participants by interpreting plan

terms incorrectly or by making decisions against the weight of evidence in the record.[7]

*Id*.

To weigh a conflict of interest more heavily, the beneficiary must provide

"material, probing evidence beyond the mere fact of the apparent conflict, that tends to

show that the administrator's self-interest caused a breach of the administrator's fiduciary

obligations to the beneficiary." *Sabatino*, 286 F.Supp. 2d at 1230. If the beneficiary meets

this threshold burden, a rebuttable presumption is created that the plan's decision was a

---

[7] As the *Abatie* Court noted, "when a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted." *Id.* at 972.

dereliction of its fiduciary responsibilities. *Id*. The plan then bears the burden of rebutting this presumption by producing evidence that the conflict of interest did not affect its decision to deny benefit. *Id*. If the plan fails to carry this burden, the Court will review the denial of benefits de novo. *Id*.; *see also Tremain v. Bell Indus*., 196 F.3d at 976.

Holl does not establish Amalgamated's conflict of interest improperly affected its denial of benefits. Although Holl appears to, based upon the prior record, argue that Blue Cross treated requests for preauthorization inconsistently in the past, Blue Cross invited Holl to submit evidence of his current disease progression, medication records, and other evidence in support of his July 2012 request for IvIG infusion therapy to treat his SMG. The Policy requires the plan administrator to evaluate the medical necessity of the requested drug or service based upon the information provided to it. Nothing in the Policy requires the plan administrator to review the participant's entire medical history to determine medical necessity. Rather, Blue Cross is directed to consider Holl's medical records in support of the current request, which it did.

The medical literature and policies considered by Blue Cross in determining medical necessity indicate that IvIG may be considered medically necessary for chronic debilitating disease "in spite of treatment with cholinesterase inhibitors, or complications from or failure of corticosteroids and/or azathioprine." Blue Cross reviewed the medical records submitted with the preauthorization request, and noted that Holl's prescription records and medication use was insufficient to substantiate medical necessity. In other words, Blue Cross could not determine if, in spite of treatment with drug therapy, Holl's SMG symptoms were not controlled. Further, Blue Cross noted Holl's multiple other

medical problems, significantly Dr. Cline's June 28, 2012 progress note indicating she was unsure that SMG was causing Holl's muscle fatigue and weakness, and that the three prior IvIG infusions had not caused as much improvement as she would have liked. Because of Holl's other significant medical problems, Blue Cross could not determine if Holl's SMG was the sole cause of his chronic debilitating symptoms.

Holl has not presented sufficient probative evidence that Amalgamated's decision was influenced by a conflict of interest. Accordingly, Amalgamated's denial of benefits is reviewed for abuse of discretion, with a low level of skepticism given to the structural conflict of interest.

**3.    Evidence Outside the Record**

In general, a plan administrator's decision may be challenged by seeking judicial review of only the record developed during the administration of the claim. *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1091 (9th Cir. 1999). This Court has previously determined that, regardless of the appropriate standard of review, a court "may not take additional evidence merely because someone at a later time comes up with evidence that was not presented to the plan administrator." *Podolan v. Aetna Life Ins. Co.*, 909 F.Supp. 1378, 1385, 1386 (D. Idaho 1995) (citing *Mongeluzo v. Baxter Long Term Disability Plan*, 46 F.3d 938, 940 (9th Cir. 1995)).

Here, Holl attempts to introduce evidence outside of the administrative record submitted in support of the 2012 preauthorization request. *See* Aff. of Huntley (Dkt. 16.) Defendants object to the Court's consideration of the evidence Holl submitted. Holl seeks to introduce as relevant Blue Cross's prior approvals for IvIG infusions in June of 2006

and again in January of 2007. Holl notes also that in 2010 and 2011, Blue Cross denied coverage, and as a result of the prior lawsuit, Blue Cross paid a settlement. Holl argues his past medical history is important because his diagnosis remains unchanged, and the "medical necessity determination" from Holl's prior preauthorization requests "remain the basis of a determination of medical necessity today." Pl.'s Reply at 2 (Dkt. 36.)

But the information from 2006, 2007, and 2010 is not part of the administrative record related to the July 2012 preauthorization request. Blue Cross on several occasions throughout the appeals process invited the submission of additional records. Blue Cross obtained the medical records relevant to the July 2012 preauthorization request directly from Holl's medical providers. Blue Cross further notified Holl it had insufficient evidence, namely his prescription drug history, as well as records from Utah, from which it could make a determination. Blue Cross informed Holl that he could submit additional evidence. Holl did not provide any additional information to Blue Cross other than the January 3, 2013 letter from Dr. Cline. Nor did Holl supplement the administrative record.

Thus, the information Holl submitted from his prior requests for preauthorization of IvIG infusion treatment is not admissible, and may not be considered. If Holl believed his prior medical history from 2006, 2007, 2009, and 2010 was necessary for Amalgamated (and Blue Cross) to make a proper determination, Holl should have submitted it for consideration. Holl was invited to supplement the administrative record throughout the appeals process, and Blue Cross asked for information. Holl failed to submit additional evidence. Holl's offer of evidence from his prior preauthorization requests amounts to nothing more than a last ditch effort to quarrel with Blue Cross's

current determination. It is an attempt to say, "look, you approved it once, we made you pay for it a second time, so why deny the preapproval now?" But that is not a sufficient argument upon review. Holl was required to present his strongest case to the plan administrator at the time the information was requested. *Cady v. Hartford Life & Accidental Ins. Co.*, 930 F.Supp.2d 1216, 1231 (D. Idaho 2013).[8]

Even if the Court could consider the prior record evidence, the Court finds that treatment rendered two or more years prior to Holl's current symptomatology is not material. Blue Cross was reviewing the request against the backdrop of Holl's disease process in June and July of 2012; what may have occurred years prior would not necessarily be relevant to a determination of medical necessity for Holl's current disease sequela. Holl has not presented evidence to explain why prior treatment with IvIG several years ago would be relevant to Blue Cross's July 2012 determination in light of the symptoms he was manifesting in 2012. The Court accordingly grants Defendants' request to strike Exhibits 1-20, found at Docket 16-2 and 16-3 and attached to the Affidavit of Robert Huntley.

**4.      Coverage Under the Policy**

---

[8] At the hearing, Holl's counsel argued that he assumed Blue Cross would look at Holl's entire medical history. But nothing prevented Holl from submitting the prior administrative record, to ensure it was considered. Moreover, on January 30, 2013, Blue Cross wrote to Holl's counsel asking for specific medical records from a list of Holl's providers. (Dkt. 23-3 at 17.) On March 15, 2013, Blue Cross wrote to Holl's counsel informing him the names of the providers who had provided medical records. (Dkt. 26-2 at 25.) Then, on March 29, 2012, Blue Cross specifically informed Holl's counsel the medical records it received from Holl's treating physicians and considered in its review. (Dkt. 23-2 at 46.) Holl therefore had ample opportunity to submit whatever records he believed supported his July 2012 preauthorization request for IvIG infusion therapy.

When considering questions of insurance policy interpretation under ERISA, federal courts apply federal common law. *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1125 (9th Cir. 2002). Under the federal common law of ERISA, the courts "interpret terms in ERISA insurance policies in an ordinary and popular sense, as would a person of average intelligence and experience." *Id.* The interpretation of an insurance policy is a question of law, and any ambiguities in the plan are construed against the insurer. *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990); *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539 (9th Cir. 1990).

Under an "abuse of discretion" standard of review, even when tempered with low skepticism given Amalgamated's structural conflict of interest, Amalgamated prevails. This standard requires that the Court uphold the administrator's decision "if it is based upon a reasonable interpretation of the plan's terms and was made in good faith." *Estate of Shockley v. Alyeska Pipeline Ser. Co.*, 130 F.3d 403, 405 (9th Cir. 1997). Both of these conditions are met here. Amalgamated, by adopting Blue Cross's determination, did not misinterpret the terms of the Policy, afforded Holl a full and fair review of his claim required by ERISA, and had an abundance of evidence supporting its determination. Amalgamated cannot be found to have abused its discretion in denying benefits under such circumstances.[9] *Bartholomew v. Unum Life Ins. Co. of Am.*, 588 F.Supp.2d 1262, 1273 (W.D. Wash. 2008).

---

[9] In *Bartholomew*, the court noted that when the decision to grant or deny ERISA benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question of whether discretion has been abused before the district court and the usual tests of summary judgment, (Continued)

Medically necessary services under the terms of the Plan are defined as the most appropriate level of service, considering the potential benefit, and proven to be effective in improving health outcomes. Blue Cross is required to consider a claimant's medical records, peer reviewed scientific evidence, professional standards, and expert opinion. Blue Cross's internal policy considers IvIG therapy medically necessary in patients with chronic debilitating disease when drug treatment has failed or caused complications.

In the record before Blue Cross, there was insufficient evidence that the cause of Holl's debilitating muscle weakness and fatigue in 2012 was SMG. Rather, Holl presented with a host of problems in addition to his SMG, including multiple organ failure, chronic pulmonary disease, sleep apnea, congestive heart failure, diabetes, and chronic kidney disease.

The medical records Blue Cross obtained from Holl's providers treating him in 2012 discussed the effects of his other chronic conditions. For example, Dr. Cline, whom Holl saw for treatment and management of his SMG, noted on June 28, 2012, that it was difficult to determine how much of Holl's muscle weakness was caused by his other medical problems as compared to the SMG. Dr. Cline noted that three IvIG infusions in early June of 2012 did not provide relief like she had hoped. Moreover, Dr. Cline observed that most of the SMG symptoms Holl was experiencing were ocular, not generalized muscle fatigue. Holl's pulmonologist, Dr. Krawtz, noted the effects of Holl's

_____

such as whether a genuine dispute of material fact exists, do not apply. *Id*. at 1266 (citing *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)).

obesity as a significant factor contributing to Holl's current symptoms of weakness and fatigue. Further, Holl's decreased pulmonary function, which was causing shortness of breath, was contributing to Holl's fatigue. Finally, Holl noted improvement in his energy levels with the use of his AVAPS for treatment of his severe sleep apnea.

Holl cites to Dr. Cline's January 3, 2013 medical opinion letter as sufficient evidence in support of his claim that IvIG treatments were medically necessary to treat his chronic SMG. But, Dr. Cline's June 28, 2012 chart note, written at the time of treatment of Dr. Holl, contradicted her January 3, 2013 medical opinion letter as well as the opinions of other physicians treating Holl during the relevant time period and discussed above. In response to Blue Cross's claim that there was insufficient evidence to support the failure of or complications from treatment with drug therapy, Dr. Cline could not say with certainty that Holl was taking his medications as prescribed. She was able to offer only an assumption that Holl's hospitalizations resulted in no need to refill his prescriptions as rapidly as required had he not been in the hospital.

Further, Dr. Cline noted that Holl had chronic kidney disease, a contraindication for treatment of SMG with steroid medication, but she did not address the assessment by Holl's nephrologist, who noted that, even with the use of steroid medications, Holl's kidney function had returned to baseline by June 26, 2012. Thus, in the record before Blue Cross, Holl's renal insufficiency did not contraindicate further steroid use to control the symptoms of SMG.  Holl was invited to supplement the record regarding his drug therapy regimen, and whether he was taking his medications as prescribed, but he did not do so other than submitting the January 3, 2013 letter from Dr. Cline.

Dr. Cline's January 3, 2013 letter does not address Blue Cross's determination that there was insufficient information in the medical record to show that SMG was the cause of Holl's chronic debilitating disease, or that IvIG therapy would resolve Holl's debilitating condition. Although Dr. Cline expressed her opinion that CellCept, Prednisone, and Azathioprine were not controlling Holl's current autoimmune symptoms, Dr. Cline did not address the effect of Holl's obesity, pulmonary disease and bronchitis, history of renal failure and chronic kidney disease, hypertension, cardiac disease, sleep apnea, osteoporosis, and gout. Holl's treating physicians for these other medical conditions were of the opinion that they played a significant part in Holl's complaints of muscle weakness, breathlessness, and fatigue, the same symptoms SMG might also cause.

Dr. Cline herself could not determine in June of 2012 whether Holl's muscle weakness and fatigue were attributable to Holl's SMG. Dr. Cline addressed only that Holl's injuries from the March 2012 auto accident were resolved and noncontributory. Thus, it was not an abuse of discretion for Blue Cross to reject the conclusions made by Dr. Cline in her January 3, 2013 letter when it had contemporaneous medical records contradicting her later statements.

The Court cannot hold, based upon the record before it, that Amalgamated's decision to adopt Blue Cross's denial of benefits constituted an abuse of discretion. The claims process underwent two reviews, was based upon  medical evidence of record in support of Holl's July 2012 preauthorization request, and was well-reasoned in light of

the opinions of Holl's treating physicians, who could not determine if IvIG therapy was having any therapeutic effect given Holl's multiple medical problems.

Thus, while Holl's diagnosis of chronic SMG[10] had not changed, Holl presented with multiple other serious medical conditions in July of 2012 which may have alternately explained his muscle weakness and fatigue. Holl has not come forward, either now or during the review process before Blue Cross, to explain why IvIG therapy would improve his condition given the effect of his other medical conditions upon his quality of life.

5.    **Holl's State Law Claims**

Holl appears also to seek a ruling from the Court regarding damages and retention of jurisdiction to consider such damages for "general/emotional and special damages," emotional distress, and loss of income. But ERISA preempts "any and all State laws insofar as they ... relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). A law relates to an employee benefit plan if it has a connection with or reference to such a plan. *Bast v. Prudential Ins. Co. of Am.*, 150 F.3d 1003, 1007 (9th Cir. 1998). Further, ERISA provides for remedies in its civil enforcement provisions. These provisions include an action to recover benefits due under the plan, an action for breach of fiduciary duties, and a suit to enjoin violations of ERISA or the Plan, or to obtain other

---

[10] At the hearing, Holl argued that Blue Cross inappropriately differentiated its treatment protocol for chronic, versus acute, SMG, and declined preauthorization for IvIG therapy to treat chronic SMG. However, Blue Cross simply had different criteria for treatment of chronic SMG. Holl has not shown why the adoption of different standards of medical necessity for treatment of chronic versus acute SMG is an abuse of discretion.

equitable relief. *Bast*, 150 F.3d at 1008 (citing 29 U.S.C. § 502(a)(1), (a)(2), and (a)(3)).

"Extracontractual, compensatory and punitive damages are not available under ERISA."

*Id.* at 1009. In *Bast*, the court held that the plaintiff's claims for out of pocket costs, loss

of income, loss of consortium and emotional distress were not recoverable. *Id.* Therefore,

under *Bast*, Holl's claims for emotional distress, loss of income, and other special

damages also are not recoverable.[11]

Holl argues he is entitled to equitable remedies, however, and that the Court has

broad discretion to award such damages. Presumably, Holl argues he may be entitled to

restitution. The plaintiff in *Bast* made a similar argument—that she was entitled to

equitable relief in the form of restitution. The court held that "equitable relief" under

ERISA does not authorize suits for money damages for breach of fiduciary duty, nor was

the recovery of monetary relief an available remedy under the guise of equitable relief.

*Bast*, 150 F.3d at 1010-11.

At the hearing, Holl conceded his state law claims were not properly before the

Court given ERISA preemption. Moreover, the Court has determined that Defendants

should prevail on their motion. Thus, it need not consider Holl's state law claims further.

### 6.     Blue Cross is Not a Proper Party

Defendants argue that Blue Cross, as the third-party claim administrator, is not a

proper party and was improperly sued. Plaintiff argues that Blue Cross is Amalgamated's

---

[11] *Bast* recognized that ERISA's preemption provisions may leave claimants without a remedy,
citing as an example a claim for wrongful death. *Bast*, 150 F.3d at 1010. However, the court simply noted
the lack of viable remedies was "an unfortunate consequence of the compromise Congress made in
drafting ERISA." *Id.*

agent and assumes the function of Administrator under the plan. However, case law holds otherwise.

ERISA defines a plan administrator as "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A). In this case, Amalgamated is designated as the Plan Administrator in the Policy. Because Blue Cross is not designated as the Plan Administrator in the policy and is not the plan sponsor, it is not liable under 29 U.S.C. § 1002(16)(A). *Moran v. Aetna Life Ins. Co.*, 872 F.2d 296, 299 (9th Cir. 1989).

Holl did not present authority to the contrary or demonstrate why his theory under agency law contravenes the aforementioned authorities.

## 7. Holl's Request for Attorney Fees

Although a fee claimant need not be a "prevailing party" to be eligible for attorney fees under ERISA, 29 U.S.C. § 1132(g)(1), the fee claimant must have achieved "some degree of success on the merits" before the Court may award fees and costs. *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010). Given the Court's ruling in favor of Defendants on their motion for summary judgment, fees and costs are not properly awarded to Holl.

# CONCLUSION

Holl, as a participant in a group health plan sponsored by Amalgamated, is entitled to covered services considered medically necessary under the definitions and policies of the Plan. Blue Cross, as the third party claim administrator, determined that the evidence before it did not establish that IvIG infusion therapy was medically necessary in July 2012 to treat Holl's SMG under the terms of the Plan. Although it is unfortunate Holl was denied medical care his treating neurologist believed may have helped him, the medical evidence before Blue Cross did not definitively suggest that IvIG infusions alleviated his current muscle weakness, or would alleviate his muscle weakness in light of his other equally debilitating conditions. Holl has not established that Amalgamated, by adopting Blue Cross's determination, abused its discretion, ignored the clear language of the Plan, or otherwise made an unreasonable determination. Therefore, Defendants are entitled to summary judgment.

## <u>ORDER</u>

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Motion for Partial Summary Judgment (Dkt. 16) is **DENIED**.

2)      Defendants' Cross-Motion for Summary Judgment (Dkt. 19) is

     **GRANTED**.

3)      A separate judgment will be entered and the Clerk is directed to close this

     case.

Dated: **April 28, 2014**

Honorable Candy W. Dale
United States Magistrate Judge